IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


LEXINGTON INSURANCE COMPANY                                              PLAINTIFF

VS.                                            CIVIL ACTION NO.  2:07CV26KS-MTP

HATTIESBURG MEDICAL PARK
MANAGEMENT CORPORATION;
BEDFORD CARE CENTER - WARREN
HALL, LLC; BEDFORD CARE CENTER -
MONROE HALL, LLC; BEDFORD HEALTH
PROPERTIES, LLC; M.E. MCELROY, INC.;
MICHAEL E. MCELROY, SR.; MICHAEL E.
MCELROY, JR.; and ROBERT M. PERRY          DEFENDANTS/COUNTERCLAIMANTS


## MEMORANDUM OPINION AND ORDER

This cause is before the court on plaintiff's supplemental motion for summary judgment,

plaintiff's motion for summary judgment on defendants' counterclaims and defendants' motion

for partial summary judgment.  From its review of all matters made a part of the record of this

case as well as applicable law, and being thus fully advised in the premises, the court finds that

plaintiff's supplemental motion for summary judgment should be denied, that plaintiff's motion

for summary judgment on defendants' counterclaims should be granted in part and denied in part,

and that defendants' motion for partial summary judgment should be granted in part and denied

in part.  The court specifically finds as follows:

### FACTUAL BACKGROUND

Plaintiff Lexington Insurance Company ("Lexington") issued a Healthcare Professional

Liability Insurance Policy (the "Policy") to defendants Hattiesburg Medical Park Management

Corporation ("Hattiesburg Medical") and M.E. McElroy, Inc., covering nursing homes they operated, including defendant Bedford Care Center - Warren Hall, LLC ("Bedford Care") (collectively, "Defendants" or "Insureds").  The Policy was effective from 12:01 a.m. CST on November 23, 2000 to 12:01 a.m. CST on November 23, 2001.  By Endorsement # 006 dated November 22, 2001, the policy period was extended to 12:01 a.m. on December 1, 2001.

Among other things, the Policy provides coverage for those amounts that the Insureds are "legally required to pay others as damages arising out of professional services provided by an insured."  The Policy states that "[t]he medical incident must take place during the policy period."[1]  The Policy provides that in addition to paying for such amounts, Lexington "will also pay defense costs" and will "[i]nvestigate and settle any claim or suit to the extent we believe is appropriate."   The Policy imposes upon Lexington the duty to defend any suit against the Insureds for a covered claim "even if any of the charges of the claim are groundless, false or fraudulent."  The Policy also states that "[a]ll claims arising from continuous, related or repeated medical incidents shall be treated as arising out of one medical incident."

On December 30, 2002, a lawsuit was filed against Defendants in the Circuit Court of Forrest County, Mississippi, by Eloise J. Kittrell by and through Katherine Kitchens, her next friend for the use and benefit of Eloise J. Kittrell (the "Underlying Lawsuit").  The Complaint and Amended Complaint (filed May 10, 2004) set forth numerous claims of negligence and other

---

[1] "Policy period" is defined as "the period commencing on the inception date shown on the Declarations and ending on the earlier of the expiration date or the effective date of cancellation of the Policy."

wrongdoing against the Insureds arising from Ms. Kittrells's care at Bedford Care.[2]  The Complaint and Amended Complaint explicitly state that Ms. Kitrell was a resident of Bedford Care from December 2001 until on or about January 15, 2003, and that the wrongs were of a continuing nature, occurring throughout Ms. Kittrell's stay there.

Lexington wrote the Insureds on November 4, 2003 advising them that Lexington would defend all claims set forth in the Complaint under a reservation of rights.  Since then, Lexington has been providing a defense to Defendants for the Underlying Lawsuit subject to its reservation of rights.  By the end of February 2007, Lexington had spent approximately $187,000.00 on behalf of Defendants.[3]

On February 8, 2007, Lexington filed a complaint in this court seeking a declaratory judgment that: 1) it has no duty to defend Defendants in the Underlying Lawsuit; 2) if it does

_____

[2] Such acts include, but are not limited to: the failure to provide Ms. Kittrell with adequate fluid intake to prevent dehydration; the failure to provide Ms. Kittell with adequate and appropriate hygiene and sanitary care to prevent pressure sores and infections from developing and progressing; the failure to provide adequate turning and repositioning; the failure to provide the minimum number of staff necessary to assist the residents with their needs; the failure to provide adequate supervision for Ms. Kittrell to prevent her from falling; the failure to properly assess Ms. Kittrell for the risk of falling; the failure to protect Ms. Kittrell from receiving injuries including bruises and bone fractures; the failure to respond to significant signs and symptoms of change in Ms. Kittrell's condition; the failure to develop, implement and update an adequate and appropriate resident care plan to meet Ms. Kittrell's needs; the failure to maintain appropriate records; the failure to adequately assess, evaluate and supervise nursing personnel; the failure to adopt adequate guidelines, policies and procedures for documenting, maintaining files, investigating and responding to complaints; the failure to properly and timely notify Ms. Kittrell's attending physician of significant changes in her physical condition; the failure to provide a safe environment; the failure to prevent Ms. Kittrell from developing urosepsis, urinary tract infections, and PEG tube infections; and the failure to protect Ms. Kittrell from physical abuse.

[3] The Underlying Lawsuit originally was set for trial for February 5, 2007.  It was continued (so that one final deposition could take place) and has been reset for trial for October 15, 2007.

have such a duty to defend, it has discharged that duty; 3) it has no duty to indemnify Defendants for any damages awarded in the Underlying Lawsuit; 4) it has no duty to use reasonable efforts to settle all or any portion of the Underlying Lawsuit; 5) if it does have a duty to use reasonable efforts to settle, it has discharged that duty; and 6) it has breached no other duty to Defendants. On March 1, 2007, Defendants answered the Complaint, requested a declaration of insurance coverage for the claims in the Underlying Lawsuit and a declaration of Lexington's duty to defend and to use reasonable efforts to settle in the Underlying Lawsuit, and asserted counterclaims against Lexington for specific performance of the Policy, breach of contract, an accounting, negligence, breach of the covenant of good faith and fair dealing, fraud/misrepresentation and bad faith.  On February 28, 2007, Lexington moved for summary judgment on its Complaint.  On March 13, 2007, Defendants moved for partial summary judgment on their request for a declaration of Lexington's duty to defend and to use reasonable efforts to settle.  On March 30, 2007, Lexington moved for summary judgment on Defendants' counterclaims.  As all three motions involved related issues of fact and law, they will be addressed together in this opinion.

<u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine

issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  The moving party, however, need not negate the elements of the non-movant's case.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) *(citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to show with "'significant probative' evidence" that a genuine issue of material fact actually exists.  *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994) (citation omitted).  To overcome summary judgment, the non-movant may not rest on the pleadings, but must identify specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case."  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.  "The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial."  *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1996) (citation omitted).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence...will be insufficient" to defeat a properly supported motion for summary judgment.).  "[C]onclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."  *Douglass*, 79 F.3d at 1429 (citation omitted).  The non-movant must

"set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

When deciding a motion for summary judgment, the evidence submitted by the nonmoving party is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the party opposing summary judgment. *Anderson*, 477 U.S. at 255. The district court, therefore, "must not resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (internal citation omitted). Summary judgment is improper where the court merely believes it unlikely that the nonmovant will prevail at trial. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5th Cir. 1962). By contrast, summary judgment for the moving party is only proper when a rational factfinder, looking at the record as a whole, could not find for the nonmoving party. *Matsushita*, 475 U.S. at 587.

"The mere existence of a disputed factual issue...does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Prof'l Mgrs., Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "With regard to 'materiality,' only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. Factual disputes that are irrelevant or that are unnecessary will not be counted." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987) (citation omitted). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiffs' cause of action does not exist as a matter of law,...all other contested issues of fact are rendered immaterial." *Topalian v. Ehrmanl*, 954 F.2d 1125, 1138 (5th Cir. 1992), *reh'g*

*denied*, 961 F.2d 215 (5th Cir. 1992).

ANALYSIS

Duty to Defend

Under Mississippi law, a liability insurer's duty to defend is broader than its duty to indemnify.  A liability insurer has an "absolute duty to defend a complaint which contains allegations covered by the language of the policy."  *Sennett v. USF&G Co.*, 757 So. 2d 206, 212 (Miss. 2000) (*citing Moeller v. Am. Guar. & Liab. Ins. Co.*, 707 So. 2d 1062, 1069 (Miss. 1996)); *see also Merchants Co. v. Am. Motorists Ins. Co.*, 794 F.Supp. 611, 617 (S.D. Miss. 1992) ("The duty to defend is broader than the insurer's duty to indemnify under its policy of insurance: the insurer has a duty to defend when there is any basis for potential liability under the policy.").

"Whether a liability insurance company has a duty to defend depends upon the language of the policy."  *Sennett*, 757 So. 2d at 212 (*citing Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 403 (Miss. 1997)).  In order to determine whether an insurer has a duty to defend under an insurance policy, Mississippi courts look to the "allegations of the complaint...[in the underlying lawsuit]."  *Id.* at 212 (*citing Delta Pride,* 697 So. 2d at 403) (brackets in original).  In doing so, the court must "look not to the particular legal theories" contained in the complaint, "but to the allegedly tortious conduct" that forms the basis of the lawsuit.  *Am. Guar. & Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 610 (5th Cir. 2001). As long as the allegations in the complaint state a claim that is "within or arguably within" a policy's coverage, there is a duty to defend. *Ingalls Shipbuilding v. Transocean Offshore Inc.*, 410 F.3d 214, 225 (5th Cir. 2005), *reh'g denied en banc*, 423 F.3d 522 (5th Cir. 2005); *1906 Co.*, 273 F.3d at 610.  Put differently, Lexington can

7

refuse to defend Insureds in the Underlying Lawsuit "only if it is clear from the face of the [Complaint in the Underlying Lawsuit] that the allegations therein are not covered [by the Policy]." *1906 Co.*, 273 F.3d at 610 (citations omitted).   The Fifth Circuit has stated that "any doubt as to the existence of a defense obligation is ... resolved in favor of the insured." *Liberty Mutual Fire Ins. Co. v. Canal Ins. Co.*, 177 F.3d 326, 331 (5th Cir. 1999) (citation omitted).

There is an exception to the general rule that the duty to defend is determined solely by looking at the complaint, where "independent facts of which the insurer is made aware or becomes aware which create a potential of liability." *Merchants*, 794 F.Supp. at 617 (citation omitted).  In such a situation, where a complaint fails to state a claim covered by an insurance policy but the insured informs the insurer that the "true facts" are inconsistent with the complaint or the insured learns from an independent investigation that the true facts present the potential for liability to the insured, the insured must defend the case.  *See Mavar Shrimp & Oyster Co. v. U.S. Fidelity & Guaranty Co.*, 187 So. 2d 871, 875 (Miss. 1966); *see also Mulberry Square Prods., Inc. v. State Farm Fire & Cas. Co.*, 101 F.3d 414, 422(5th Cir. 1996) (insurer has duty to defend when presented with extrinsic facts triggering coverage and insurer has knowledge of them or could obtain knowledge by means of reasonable investigation; *U.S. Fidelity & Guar. Co. v. B & B Oil Well Serv., Inc.*, 910 F.Supp. 1172, 1182 (S.D. Miss. 1995) (stating that "if the insurer knows of facts which, if proven, would result in coverage under its policy, then its duty to defend is not discharged merely because the facts alleged in the underlying lawsuits appear to locate the claims outside of coverage or within an exclusion."); *Meng v. Bituminous Cas. Corp.*, 626 F.Supp. 1237, 1241 (S.D. Miss. 1986) (*citing State Farm Mut. Auto. Ins. Co. v. Taylor*, 233 So. 2d 805, 808 (Miss. 1970)) (stating that insurer has duty to defend notwithstanding a policy

8

exclusion where "a divergence [ ] exist[s] between the facts as alleged in the petition and the actual facts as they are known to or reasonably ascertainable by the insurer").

In the case *sub judice*, the Complaint explicitly states that "[o]n or about December 2001...[Ms. Kittrell] was admitted to Bedford Care" and reiterates several times that Ms. Kittrell was a resident of Bedford Care from December 2001.  Elsewhere, Ms. Kittrell avers that the alleged wrongs "occurred throughout [her] stay at Defendants' facility."  It is undisputed that the Policy expired at 12:01 a.m. on December 1, 2001.  Lexington argues that this means that, at most, the time period Ms. Kittrell is complaining about overlapped the Policy by one minute (assuming *arguendo* that Ms. Kittrell checked into the facility at midnight on December 1, 2001, an unlikely scenario).   Lexington argues that this conclusively establishes that Policy was not in effect at the time of the alleged acts of negligence and, therefore, there is no duty to defend.

In response, Defendants aver (and Lexington appears to concur) that Ms. Kittrell was actually a resident of Bedford Care for two separate time periods - April 6, 2001 to July 3, 2001 and June 5, 2002 to January 15, 2003.[4]  They argue that in the Underlying Lawsuit Ms. Kittrell has alleged acts of negligence against Insureds that occurred during the policy period and has

---

[4] This appears to have been confirmed in an email dated August 19, 2004 from Lorenzo T. Ameno, Complex Claims Director for AIG (of which Lexington is an affiliate) to a "S. Worrell" at Hattiesburg Medical, in which Mr. Ameno stated in reference to Ms. Kittrell's claim: "As we discussed, there are two residency periods at issue in this suit: The first is that of 4/16/01-7/3/01.  The second is that of 6/6/02 - 1/15/03."  This email chain was forwarded to John Wade at Brunini, Grantham, Grower & Hewes, PLLC, counsel for Hattiesburg Medical.  In addition, in a letter dated January 30, 2007 from Robert Frey at Butler, Snow, O'Mara, Stevens & Cannada, PLLC (Lexington's counsel) to Mr. Wade, Mr. Frey states: "I am aware, too, that although the Complaint makes no reference to it, Plaintiff's decedent was a resident at the nursing home in question for some weeks within the Lexington policy period."  And in an *in limine* motion filed by Defendants in the Underlying Lawsuit, they state that "Ms. Kittrell resided at the nursing home from April 6, 2001, through July 3, 2001, and from June 5, 2002, through January 21, 2003."

referenced many of these acts in her Complaint and Amended Complaint.  Defendants argue that

discovery responses in the Underlying Lawsuit (to which Lexington was privy), including an

expert report and deposition, make reference to numerous examples of alleged wrongdoing that

occurred during the policy period.  Specifically, Defendants point to the report by Holly L

Brown, R.N., one of Ms. Kittrell's experts in the Underlying Lawsuit, as well as to her October

20, 2006 deposition.[5]  In addition, Defendants point to the clause in the Policy that provides that

"[a]ll claims arising from continuous, related or repeated medical incidents shall be treated as

arising out of one medical incident."

      In response, Lexington argues that the *Mavar* exception is inapplicable to the instant case

and that the court should not look beyond the December 2001 date in the Complaint in evaluating

whether there is a duty to defend.  Lexington argues that had Ms. Kittrell's first stay at Bedford

Care been her *only* stay, then the allegation that she was a resident "from December 2001" would

be "false" within the meaning of *Mavar* and its progeny.  Lexington argues that for whatever

reason, Ms. Kittrell has made a conscious decision to define the relevant time period of the

lawsuit from December 2001 on, and to seek recovery only for those alleged wrongs that

---

[5] Ms. Brown has offered her opinion that the Insureds committed numerous acts of negligence and other wrongdoing between April 6, 2001 and July 3, 2001.  At her deposition on October 20, 2006, Ms. Brown testified that during May and June of 2001, Ms. Kittrell fell twice as a result of the Defendants' failure to provide a safe environment.  She testified that Defendants did not have an interim care plan, there was no investigation of Ms. Kittrell's falls that occurred on May 28, 2001 and June 5, 2001 and there was no update of any care plans after these falls.  She was also critical of Defendants for failing to notify the treating physician after Ms. Kittrell's fall on May 28, 2001.  Ms. Brown testified that the Defendants' failure to perform a comprehensive assessment of these two falls "was a gross failure on the facility's part."  Ms. Brown was also critical of the Defendants for other alleged breaches of the standard of care in connection with the treatment of Ms. Kittrell from April 6, 2001 through July 3, 2001, including failure to prevent urinary tract infections and failure to provide adequate nutrition.

occurred from December 2001 to January 15, 2003 and that this decision was her choice, as "master of her complaint."[6]  Lexington further notes that Ms. Kitrell amended her complaint on May 10, 2004 - a year and a half after she filed her original Complaint  - and the relevant time period explicitly set forth in the Amended Complaint remained December 2001 to January 15, 2003.

        The court is not convinced that the allegation that Ms. Kittrell stayed at Bedford Care from December 2001 is not "false" within the meaning of *Mavar*.  Both Lexington and Bedford Care apparently aver that Ms. Kittrell was a resident of Bedford Care from April 6, 2001 to July 3, 2001 and from June 5, 2002 to January 15, 2003.  These time periods obviously do not encompass December 2001, which is when Ms. Kittrell alleges in her Complaint that she began her residency at Bedford Care.  Moreover, as pointed out by Defendants, although at first glance Ms. Kittrell's allegations appear to date from December 2001 onward, there are acts alleged in the Complaint as well as identified by her expert that pre-date December 2001 and therefore would give rise to a duty to defend.  Indeed, it appears to the court that at least some of the alleged wrongdoing identified in the Complaint and the Amended Complaint in the Underlying Lawsuit is the same as that discussed by Ms. Brown as having occurred during the policy period (such as falls and failure to prevent urinary tract infections).   In addition, at least some of the

_____

        [6] In her Amended Complaint, Ms. Kittrell avers that "[a]s of December 2001, [she] was no longer competent to handle her own affairs, due to multi-infarct dementia, and her cognitive skills were impaired.  She no longer had the conscious awareness necessary to be able to fully comprehend all of the elements necessary to know that she had been the victim of nursing home negligence and resident rights violations."  Thus, Lexington hypothesizes that "plaintiff made the strategic choice not have her second-stay case marred and qualified by proof that the first stay was a good one – good enough for a competent Mrs. Kittrell to have appreciated the care she received, and good enough for Mrs. Kittrell's family to have brought her back for a second stay."

alleged negligent acts appear to be "continuous, related or repeated" incidents that - even if they occurred after the Policy expired - would likely relate back to the policy period.

Thus, for the foregoing reasons, the court concludes that the allegations in the Underlying Lawsuit are within, or at least arguably within, the coverage of the Policy and therefore, Lexington has a duty to defend Insureds in the Underlying Lawsuit. Thus, this court denies Lexington's motion for summary judgment, and grants Defendants' motion for partial summary judgment, on the issue of a duty to defend. In addition, in light of the issues discussed above (and noting again that the duty to defend is broader than the duty to indemnify), the court agrees with Defendants that it would be premature to rule on the issue of indemnification. Therefore, the court will hold its ruling on this issue in abeyance, pending the outcome of the Underlying Lawsuit.[7]

Finally, Lexington has moved for summary judgment on Defendants' extra-contractual counterclaims for breach of contract, negligence, breach of the duty of good faith and fair dealing; fraud/misrepresentation; bad faith; and an accounting. These claims will be addressed below.

Breach of Contract/Accounting

Defendants have asserted two distinct breach of contract claims. The first is based upon Lexington's assertions that there is no insurance coverage and that it has no duty to defend the Insureds in the Underlying Lawsuit. As set forth above, the court has found that there is a duty to

---

[7] Lexington has also moved for summary judgment on a declaration that it has breached "no other duty" to Defendants. The court finds this request to be vague, and also notes that defendants have not referred to breaches of any duties other than those mentioned in their counterclaims. Accordingly, summary judgment is denied.

defend and it has declined to rule on the issue of insurance coverage.  Accordingly, summary judgment for Lexington on this claim must be denied.

The second breach of contract claim is based upon Lexington's alleged failure to reimburse the Insureds for payments made in excess of the self-insured retentions under (1) Lexington Insurance Policy No. 71191450[8] and (2) the Policy at issue in this case.  This is also the basis for the accounting claim.  Lexington argues that "[d]efendants have offered no evidence to support this allegation, much less evidence that they brought such costs to the attention of Lexington and Lexington refused to pay."  They also argue that "[a]n accounting is inappropriate because the information Defendants seek is in their possession."  Defendants have responded with an affidavit from Steve Worrel, the Treasurer and Chief Financial Officer for Hattiesburg Medical.  Mr. Worrel avers that Hattiesburg Medical's records reflect that the Insureds have made payments in excess of the self-insured retentions and self-insured retention aggregates under the insurance policies.  He avers that several times during 2005, he wrote to Lexington and attached a summary of the claims and payments made by the Insureds (the letters are attached to his affidavit, but the summaries are missing), and also spoke with Lexington representatives regarding this matter.  In the letters and conversations, Mr. Worrel requested that Lexington compare the documentation provided by the insureds with Lexington's documentation to determine whether Lexington agreed with the Insureds' finding that they had paid amounts in excess of the self-insured retentions and that if Lexington agreed, it should refund the excess payments to the Insureds.  Mr. Worrel also requested from Lexington an accounting of the

---

[8] This policy was in effect from 11/10/99 to 11/10/00.  Under the terms of both policies, the Insureds are obligated to pay the first $25,000 of any "occurrence," including defense costs, with a self-insured retention aggregate of $125,000.

payments credited against the self-insured retentions under both insurance policies to determine whether all of the payments made by the Insureds had been properly credited.  During 2006 and 2007, Mr. Worrel avers that the Insureds again contacted Lexington to inquire regarding the status of the Insureds' request and to date, Lexington has never provided the Insureds with an accounting or reimbursed the Insureds for the amounts the Insureds have paid in excess of the self-insured retentions.[9]  Based on the above, the court finds that there is a genuine issue of material fact as to whether Lexington has breached the insurance policies and whether Lexington is entitled to an accounting and therefore summary judgment for Lexington on these claims must be denied.

Fraud/Misrepresentation

This claim is based upon a representation made by Lexington in its November 4, 2003 reservation of rights letter.  In that letter, Lexington represented to the Insureds that there is an exclusion in the Policy for "Penalties," defined as "any fines, penalties, punitive, exemplary or multiplied damages" and it advised Insureds that it would "not defend or pay" such claims.  However, that exclusion had been deleted from the Policy by Endorsement # 003 effective November 23, 2000.  Lexington has admitted that it made this mistake.  Defendants argue that the mistake had a detrimental effect upon them because at the time the mediation in the Underlying Lawsuit was conducted on December 18, 2006 (the "Mediation"), Lexington was

---

[9] Lexington argues that Mr. Worell's affidavit is conclusory, incomplete and insufficient to create a genuine issue of material fact.  The court disagrees.  Moreover, the court finds that Lexington has failed to meet its initial burden of demonstrating an absence of a genuine issue of material fact on this issue.

continuing to make this representation.[10]   Insureds argue that there is a genuine issue of material fact as to (1) whether the failure to settle the Underlying Lawsuit was due, at least in part, to Lexington's unwillingness to contribute any amount toward settlement which would be attributable to the plaintiff's claim for punitive damages; and (2) whether such failure to settle proximately caused damage to the Insureds.

Lexington argues that this claim must fail as a matter of law because Defendants could not have reasonably relied on Lexington's mistake concerning the Policy's scope, as the Policy (with Endorsement # 003) explicitly state that punitive damages are covered.  For this proposition, Lexington cites to *Strong v. First Family Fin'l Servs., Inc.*, 202 F.Supp. 2d 536 (S.D. Miss. 2002).  In *Strong*, the court held that there was "no reasonable possibility of recovery" for plaintiff on his claim that an insurance company failed to disclose that credit insurance was not required or that they misrepresented that such insurance was not required as a condition to obtaining his loans, where the loan and insurance documents conspicuously and clearly disclosed that, in fact, credit insurance was not required.  *Id.* at 543-44.  Defendants attempt to distinguish *Strong* by arguing that "[i]n the present case, the issues [*sic*] is whether Lexington's misrepresentation regarding coverage for punitive damages proximately contributed to the underlying litigation failing to settle."  However, that is not the point.  The fact of the matter is that Defendants had a copy of the Policy and Endorsement # 003 at the time of the Mediation.  Therefore, the court agrees with Lexington that Defendants could not have reasonably relied on the misrepresentation.  Moreover, Defendants have produced no evidence in support of this claim.  Rather, they have simply made conclusory and speculative allegations

---

[10] The representation was retracted by letter dated January 30, 2007.

regarding what might have occurred at the Mediation in the absence of the misrepresentation.

Accordingly, summary judgment for Lexington on this claim must be granted.

<u>Negligence/Breach of the Covenant of Good Faith and Fair Dealing</u>

This claim is based on Lexington's failure to settle the underlying litigation. Defendants have produced an affidavit from Danny Blackledge, Corporate Compliance Officer at Hattiesburg Medical, who attended the Mediation. Mr. Blackledge avers that no Lexington employee attended the Mediation; rather, Lexington's representative, Denise D'Assaro, participated by telephone instead. At the Mediation, Lexington offered no more than $200,000 to settle the case, despite defense counsel's recommendations that the Underlying Lawsuit may have a larger settlement value (and despite the settlement values placed on the Underlying Lawsuit by defense counsel). Mr. Blackledge avers that based on his experience in this type of litigation, and specifically from previous mediation experience in which Ms. D'Assaro participated, "her demeanor on this occasion appeared to me to be a unilateral, inflexible and unreasonable approach toward this mediation settlement." Mr. Blackledge concludes: "I believe that had Lexington negotiated in good faith, the underlying litigation could have been settled at the mediation or earlier."[11]

In *Hartford Accident & Indem. Co. v. Foster*, 528 So. 2d 255, 265 (Miss. 1988), the Mississippi Supreme Court adopted the so-called "failure to settle" cause of action. The court

---

[11] In addition, Mr. Blackledge avers that the mediator, Larry Latham, "expressed frustration over Lexington's inflexible approach to settlement because of its unwillingness to offer more than $200,000.00." According to Mr. Blackledge, "Mr. Latham explicitly stated, in very strong words, that he believed the case could have been settled had Lexington been willing to offer an amount above $200,000.00, but within defense counsel's recommended settlement range." The court agrees with Lexington that these statements are inadmissible hearsay and therefore will not be considered by the court.

described the insurer's duty as follows:

> [W]hen suit covered by a liability insurance policy
> is for a sum in excess of the policy limits, *and an offer*
> *of settlement is made within the policy limits*, the insurer
> has a fiduciary duty to look after the insured's interest at
> least to the same extent as its own, and also to make a
> knowledgeable, honest and intelligent evaluation of the
> claim commensurate with its ability to do so.  If the carrier
> fails to do this, then it is liable to the insured for all damages
> occasioned thereby."

*Id.* (emphasis added).  Defendants have not alleged - nor have they offered any evidence to suggest - that any offer of settlement was made by Ms. Kitrell.  Their argument is that *Lexington* failed to make a sufficient offer.  However, as Lexington puts it, "[i]t is one thing to prove that plaintiff's last demand was reasonable, and should have been met.  It is quite another to prove that a higher offer would have been reasonable, *and*, if made, would have been accepted" (emphasis in original).  Moreover, even if the rule of *Hartford* applied, Defendants' "evidence" of lack of reasonable efforts to settle consists of statements regarding Mr. Blackledge's impression of Ms. D'Assaro's demeanor at the Mediation, and well as conclusory and speculative statements regarding Mr. Blackledge's opinion as to the reasonableness of Lexington's offer (based on his "experience" in other litigation and with Ms. D'Assaro in prior mediations).  And there is no evidence that Lexington failed "to make a knowledgeable, honest and intelligent evaluation of the claim." *Hartford*, 528 So. 2d at 265.  The court agrees with Lexington that plaintiff has failed to meet its burden and therefore summary judgment is warranted for Lexington on these claims.[12]

---

[12] For the same reason, the court denies Defendants' motion for partial summary judgment, and grants plaintiff's supplemental motion for summary judgment, on the issue of "duty to use reasonable efforts to settle."  In making these rulings, the court emphasizes that it is

Bad Faith

Defendants' bad faith claim consists of five separate bases: (1) that Lexington misrepresented the scope of insurance coverage for punitive damages under the Policy; (2) that Lexington wrongly and/or negligently refused to settle the underlying litigation; (3) that Lexington refused to reimburse the Insureds and refused to provide an accounting to the Insureds for payments in excess of the self-insured retentions under the policies; (4) that Lexington was operating under a conflict of interest, pursuant to *Moeller v. Amer. Guar. & Liab. Ins. Co.*, 707 So. 2d 1062 (Miss. 1996), and never informed Insureds of the existence of this conflict; and (5) that Lexington was wrongfully attempting to manipulate the defense of the Underlying Lawsuit based solely on insurance coverage concerns by requesting a special verdict form allocating liability and damages between Ms. Kittrell's two residency periods at Bedford Care.

As for the first two bases, the court has already addressed these above and found them lacking and, therefore, they are not bases for a bad faith claim. In support of the fifth basis, Defendants have offered Mr. Wade's affidavit.  Mr. Wade avers that on or about January 25, 2007, he received a call from Bill Lancaster, trial counsel for Defendants in the Underlying Lawsuit, who told him that Lexington wanted him to request the special jury verdict form and that this issue might arise at a hearing on January 26, 2007.  Mr. Wade told Mr. Lancaster that the Insureds objected to the use of such a special verdict form because it would likely cause any verdict for Ms. Kittrell to be inflated.  Mr. Wade then wrote a letter to the Insureds objecting to the use of a special verdict form.  At the hearing on January 26, 2007, Bob Frey, coverage

---

not expressing an opinion on whether such a duty may arise in the Underlying Lawsuit in the future - for example, if Ms. Kittrell were to make a settlement offer within policy limits at any future settlement or pre-trial conference.

counsel for Lexington, suggested the special verdict form to Mr. Wade, and Mr. Wade told Mr.

Frey that the Insureds would not agree.  The court agrees with Lexington that this evidence

merely establishes that the special jury verdict form was suggested by Lexington - not that it was

or will be implemented.  Accordingly, the court finds that - at this juncture - it cannot serve as a

basis for a bad faith claim.[13]

As for the fourth basis, Defendants argue that Lexington's selection of defense counsel

placed it under a conflict of interest, pursuant to *Moeller*,[14] which was never disclosed to them.

In the November 4, 2003 reservation of rights letter, Lexington wrote: "As you are aware, we

have accepted notice of this suit and assigned the defense of this matter to William Lancaster,

Esq. of Alford, Clausen & McDonald, PLLC."   Earlier, in an April 22, 2003 letter from Helen

Johnson Alford to AIG, it is stated:  "Enclosed please find a copy of the complaint we received

from Steve Worrell [at Hattiesburg Medical].  Unless we hear from you to the contrary, we will

appear and defend the interests of all defendants."   Mr. Worrell is copied on this letter.  Based

on these letters, Lexington argues that Defendants are the ones who selected defense counsel -

not Lexington.  The court does not make that same conclusion from reviewing the letters.  The

fact that Mr. Worrel sent the complaint to Ms. Alford does not necessarily mean that Defendants

chose defense counsel.  More importantly, the April 22 letter pre-dates the November 4

---

[13] The court is not expressing an opinion on whether it would constitute bad faith if
Lexington were to insist upon the use of a special jury verdict form and the form were actually to
be used at trial.

[14] In *Moeller*, the Mississippi Supreme Court held that where an insurance company is
providing a defense under a reservation of rights, the insurance company has a "special
obligation" to its insured because of the potential conflict of interest.  In such a situation, the
insurer must allow its insured to hire its own attorney (and must cover those costs).  707 So. 2d at
1069.

reservation of rights letter - which, according to *Moeller*, is when the alleged conflict of interest and concomitant duty to allow Defendants to hire their own counsel, would have arisen.  The court finds that there is a genuine issue of material fact as to whether Lexington chose defense counsel and whether Lexington advised Defendants of the potential conflict of interest.  Finally, as for the third basis, as discussed above, the court also finds that there is sufficient evidence to create a genuine issue of material fact.

Accordingly, because there are two viable bases for a bad faith claim, summary judgment for Lexington on this claim is denied.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Lexington's supplemental motion for summary judgment (**# 6**) is denied; that Lexington's motion for summary judgment on Defendants' counterclaims (**# 20**) is granted in part and denied in part and that Defendants' counterclaims for fraud/misrepresentation, negligence and breach of the covenant of good faith and fair dealing are dismissed; that Defendants' motion for partial summary judgment (**# 12**) is granted in part and denied in part; that this court declares that Lexington has a duty to defend the Insureds in the Underlying Lawsuit; and that the issue of indemnification is held in abeyance pending the outcome of the Underlying Lawsuit.

IT IS FURTHER ORDERED AND ADJUDGED that this case is stayed pending the completion of the Underlying Lawsuit.  Within ten (10) days of the entry of final judgment in the Underlying Lawsuit, the parties shall notify this court of any remaining or additional issues to be addressed.  If there are no such issues, this case shall be dismissed.

SO ORDERED and ADJUDGED on this, the 6th day of July, 2007.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE